DECISION
Plaintiff, Kinetic Systems, Inc. ("Kinetic") filed a petition to enforce a mechanics' lien against the Defendants, Rhode Island Industrial Facilities Corporation ("RIIFC") and Rhodes Technologies, Inc. ("Rhodes"). Kinetic seeks to recover for work done and materials furnished to RIIFC, the owner, and Rhodes, the lessee, in connection with contractual work performed on the project known as the "Building 5 Expansion Project" located at 498 Washington Street, Coventry, RI. ("Project"). This Project encompassed a multi-million dollar pharmaceutical plant expansion, originally estimated to cost approximately $30 million, but which eventually exceeded $90 million. Kinetic provided certain process piping work on the Project, which was originally estimated to cost approximately $10.8 million but which eventually exceeded $18 million.
The Defendants answered the case and asserted two counterclaims alleging breach of contract and fraud and misrepresentation. Kinetic answered the counterclaim and amended its complaint to add claims for breach of contract and quantum meruit. All such matters were tried before the Court over several weeks during the period from January through May of 2003.
The Court will address the various theories of recovery in the following order:
 • Kinetic's mechanics' lien petition against Defendants.
 • Kinetic's breach of contract and quantum meruit claims against Rhodes.
 • Rhodes' breach of contract and fraud and misrepresentation claims against Kinetic.
 I. KINETIC'S MECHANICS' LIEN PETITION AGAINST DEFENDANTS
Rhodes challenges the constitutionality of the Rhode Island Mechanics' Lien statute, R.I.G.L. 34-28-1, et seq. ("Mechanics' Lien Statute"). Rhodes relies on the decision of the Honorable Michael Silverstein inSells/Green bldg. Co., Inc. v. Rossi, C.A. No. PB 02-1019, consolidated with Gem Plumbing Heating Co., Inc. v. Rossi, C.A. No. PB 02-2778 (R.I. Super. Ct. April 23, 2003). In that decision, Judge Silverstein found that the Mechanics' Lien Statute lacks a provision for a hearing to determine the validity of a lien until after the filing of a petition, implicates a significant private property interest, and represents a substantial risk of erroneous deprivation of said interest. Relying on those conclusions and pertinent holdings of the United States Supreme Court, Judge Silverstein held that the Mechanics' Lien Statute is unconstitutional beyond a reasonable doubt. Sells/Green Bldg. Co., Inc.
at 28. This Court agrees with Judge Silverstein's well-reasoned decision and finds that the Mechanics' Lien Statute is unconstitutional in derogation of the United States Constitution and Rhode Island Constitution.
 II. KINETIC'S BREACH OF CONTRACT AND QUANTUM MERUIT CLAIMS AGAINST RHODES
A. TYPE OF CONTRACT
Kinetic and Rhodes entered into a contract ("Contract") in connection with the Project. (Exhibit K-7B.) It is clear that the Contract is a cost-reimbursable time and materials contract. The Contract did contemplate that the Project could be converted to a lump sum or guaranteed maximum price contract ("GMAX"). Such conversion, however, never occurred, largely due to Rhode's refusal to negotiate or accept such a contract. The Contract did contain a target price, so-called, but the contract language made it clear that such price was in fact an estimate that would not account for factors outside Kinetic's control. (Exhibit K-7B, section 3.2.1.)
Rhodes' attempt to rebut the cost-reimbursable time and materials payment provisions set forth in the Contract is not persuasive. The testimony of Dan Flood ("Flood"), a Kinetic official, supports the contention that the Contract was never converted from a cost-reimbursable time and material basis. His testimony suggests that the reason a lump sum provision was not negotiated was because Rhodes wished to avoid a project on which it might be required to pay a bonus. Rhodes attempts to suggest that the word "target price" as used in the contract has special meaning. Rodney Cameron ("Cameron"), an expert engaged by Rhodes who had also provided services to SUITT Construction Company ("SUITT"), one of two construction managers used by Rhodes on the project, expressed the view that target price means something more than "estimate." That line of testimony was vague and affords no basis for departing from the clear language of the Contract, which established payment on a cost-reimbursable time and materials basis.
 B. RHODE'S ACTIONS THAT IMPACTED KINETIC'S PERFORMANCE
Several actions by Rhodes and/or it agents during the course of the Project negatively impacted Kinetic's performance under the Contract.
(1) Delivery of the Project Design and Structure
Rhodes initially contracted with PFI Construction Corporation ("PFI") as a construction manager for the Project to perform all engineering, procurement, and construction management ("EPCM"). Rhodes, however, opted to engage PFI without a written contract outlining PFI's duties and obligations. PFI never completed the design, which was supposed to have been provided to Kinetic in September of 2000. As a result, Kinetic had to complete a substantial portion of the design documents. These documents were not completed until November of 2001, over a year late. Kinetic's original work plan of having all isometric drawings ("Isometrics") to offsite piping fabricators so that all piping could be fabricated and returned to the site before installation was thereby thwarted. (Exhibit K-167). Kinetic was thus projected into a reactive mode where it could install only what was delivered as it was delivered.
The late delivery of the building structure several months after the planned completion date had an equally negative impact on Kinetic's original work plan. The lack of structure caused many practical problems, including the need to tent around and create ambient warmth prior to welding joints. Moreover, because the building's civil, structural and architectural elements ("Building Elements") had not been completed in a timely manner, Kinetic was prevented from field verifying Isometrics prior to fabrication. Repeated references in the Contract to field verification of the isometric drawings make it clear that the parties intended that the existing structural conditions would be in place to allow field verification. Again, rather than being able to proceed in an orderly fashion, Kinetic was compelled to proceed reactively where it could install only in those areas to which it could gain access, such areas often being crowded with tradesmen other than its own pipefitters.
(2) Rhodes' Replacement of the EPCM Manager
Rhodes' EPCM problems were exacerbated by its decision to change construction managers during the course of the Project. PFI initially held all authority over EPCM, which, as previously noted, was originally estimated at $30 million, but eventually exceeded $90 million. Rhodes, also as previously noted, never entered into a written agreement with PFI to define its responsibilities or obligations. By February of 2001, with the delivery of the Building Elements already several months late, Rhodes began to consider PFI's termination. James Becica ("Becica"), a Rhodes' consultant, acknowledged that a delay of three to six months might ensue if in fact PFI were replaced with another contractor. (Exhibit K-140/Exhibit K-169, Becica Presentation, p. 45). During the months of April and May of 2001, Rhodes commissioned the firm of Sordoni-Skanska USA ("Sordoni"), a construction management firm, to analyze the status of the Project and to offer solutions. Sordoni's evaluation led Rhodes to conclude that with a change in construction managers, the Project's completion date would be delayed to late January of 2002. (Exhibit K-143/Exhibit K-169, Becica Presentation, p. 46.) The projected January 2002 completion date did not factor in other problems with the Project, namely the delay in the creation of the Building Elements and Rhodes' unwillingness to authorize overtime wages and premiums to attract qualified pipefitters to the Project. Exhibit K-143, p. 38/Exhibit K-169, Becica Presentation, p. 35. Sordoni's report confirmed the inadequate performance of PFI in its failure to effect a check and balance between design and construction components of the Project. (Exhibit K-143, p. 4, para. 2.) The report also identified several problems created by PFI's poor construction management covering such areas as flaws in the schedule analysis and deficiencies in Project staffing.
Following Sordoni's report, Rhodes terminated PFI and SUITT was engaged as the new construction manager. The change in Project management had a significant impact on the efficiency and schedule for the process piping work being performed by Kinetic. The impact of this decision, including the lack of an orderly transition from PFI to SUITT, further delayed the Project. As Flood testified, this uncoordinated transfer of construction management to SUITT resulted in the Project shutting down for several days. The work shut down was costly and significantly damaged the productivity of the Kinetic work force. After arriving on the Project, it took SUITT several months to comprehend the previous overhaul of standard project design protocols by PFI and to appreciate the labor issues that existed. Furthermore, PFI did not deliver the design documents to Rhodes until after August 15, 2001, more than three months after PFI had been terminated from the Project.
As previously noted, Rhodes' own estimate of the delay to be occasioned by this change in construction management was three to six months. (Exhibit K-140.) Becica opined that these failures in the Project's EPCM teams severely undermined Kinetic's ability to perform the work in a cost-efficient and timely manner. Moreover, because of these failures, Kinetic had been required to absorb a significant amount of the design completion duties that previously had been assigned to PFI. These combined failures within the Project's construction management function prevented Kinetic from performing the process piping work close to original cost and schedule expectations.
(3) Alteration of Industry-Standard Design Protocols
(a) PFI's Directive to "Field Verify" Based on Secondary Sources
The original construction plan presented to Kinetic, upon which Kinetic's bid and target price were based, contemplated having the Building Elements in place prior to fabrication and installation of the process piping in order that the Isometrics could be field verified against in-place field conditions prior to fabrication. PFI's deficiencies in performance, however, threatened the integrity of the process piping fabrication schedule. PFI, therefore, directed that Kinetic release the Isometrics for fabrication based on verification against secondary sources rather than true field verification. This directive from PFI significantly diminished Kinetic's labor productivity.
The Contract clearly identifies a plan whereby Kinetic would be allowed to field verify the Isometrics against field conditions, explaining that "the field dimensions given on the Isometric Drawings are approximate and shall be field verified by this contractor prior to fabrication." (Exhibit K-7A, p. 22 "Description of the work.") The necessity of field verification was critical to the Project, which required considerable precision for successful completion.
Early in Kinetic's work, it became clear that the delayed construction of the Building Elements would prevent true field verification. Kinetic repeatedly advised 7 Rhodes and PFI of this situation and the consequences that would result. (Exhibit K-69, Exhibit K-70, Exhibit K-74, and Exhibit K-77 in pertinent part.)
Rhodes suggested that PFI had not issued the "proceed without true field verification" directive. Yet, even Robert Histen ("Histen"), a PFI official, testified that when the late construction of the building resulted in a situation where already-postponed fabrication benchmarks were threatened, PFI directed that Kinetic not wait any longer for field conditions to be installed, but that the Isometrics be sent out for fabrication without true field verification. Histen not only admitted that PFI had ordered that Kinetic send out the Isometrics for fabrication without performing a true field verification, but also that PFI had accepted the fact that this decision would inevitably lead to productivity-damaging re-work on the Project. Kinetic did its best to verify against approximate field conditions based on secondary sources, yet there was no way to accurately fabricate pipe without the existing field conditions in place.
(b) PFI's Directive that Isometrics Take Precedence Over PID's
Cameron and Normandt both acknowledged that in the process piping industry, "Process and Instrumentation Diagrams" ("PID's") are the "bible," that Isometrics should always be checked against PID's, and that failure to do so will result in substantial re-work. Several of Kinetic's witnesses testified about PFI's directive that Isometrics take precedence over PID's on the project, a situation brought about by the fact that PFI's PID design was so undeveloped and late that PFI did not want to risk losing any further fabrication benchmarks while waiting for PID revision and reissuance. These witnesses also testified as to how this change in standard design protocols inevitably led to substantial re-work, since there was no "check and balance" to assure that the Isometrics design line would actually fit within the framework of the schematic routing to be controlled by the PID's.
Rhodes attempted to minimize the significance of PFI's productivity-damaging directive by claiming that this directive had only applied to certain Isometrics, and not the full complement of those developed for the Project. Histen initially testified to this effect. However, in his extended testimony, Histen acknowledged that, because of the stalled PID work by PFI, PFI did in fact direct that Isometrics take precedence over PID's. Because this directive amounted to a dramatic change from a normal design protocol, Kinetic documented this change in confirming memoranda to PFI. (Exhibit K-50/161 in pertinent part.)
Histen also testified that following PFI's giving of this directive, Histen had attended an internal meeting at PFI where PFI had decided that it no longer wanted to follow the "Isometrics over PID" directive. However, Histen could not testify whether that change in directive had ever been communicated to Kinetic, and if so, how it had been communicated and/or by whom. Histen did acknowledge that he had not communicated this change. Rhodes failed to produce any witness to support the position that PFI's internal decision to change the "Isometrics over PID" directive had been communicated to Kinetic.
PFI's directive that Isometrics take precedence over PIDs, along with PFI's directive to proceed with fabrication before true field verification could occur, caused substantial re-work on the Project. All witnesses to testify on the subject were basically in agreement that the cumulative effect of these design decisions had a devastating impact on Kinetic's ability to install the process piping on this Project in a timely and cost effective manner.
(4) Choices Regarding the Labor Market
Compounding the impact imposed on Kinetic's work due to numerous deficiencies of the construction managers, Kinetic's performance was further retarded due to budgetary decisions made by Rhodes as it related to the workforce utilized on the Project. Shortly after Kinetic had executed its Contract, Rhodes refused to allow Kinetic to pay market rates and/or incentives to its workforce. Kinetic accordingly could not attract the necessary pipefitters that were being attracted to other projects with premium pay and overtime, and was therefore constrained in its ability to overcome the impacts imposed by the above-described failures in EPCM and Building Elements.
Under the Contract, Rhodes had retained authority for attracting labor to the Project through financial incentives, In return it bore the risk and potential rewards of making decisions related to the distressed labor market. The contractor would normally retain discretion as to whether to pay for overtime or premiums to attract labor forces. But as Shamblen acknowledged, Rhodes retained this control through PFI. (See also Exhibit K-7B, section 2.1.1.)
In retaining control over whether premiums would be paid to attract qualified pipefitters, Rhodes retained the risk associated with that responsibility. The Contract provided:
 "Overtime inefficiency of 10% is included, however, this does not account for the current labor market conditions in Rhode Island and the surrounding area. Any additional overtime inefficiencies are not accounted for in our target price.
 Costs for base rate increases or incentive programs to attract or retain local or out of town pipefitter labor are not included. All labor costs are based on normal labor market conditions." (Exhibit K-7B, section 3.2.1.)
As Shamblen testified, Rhodes' reason for including the risk and control provisions in the Contract was Rhodes' unwillingness to get into a "bidding war" with other projects in the area that were paying premiums and bonuses as a means of attracting qualified labor to an overly burdened union labor market. Nevertheless, despite the fact that Rhodes retained all authority regarding incentive strategies in hiring qualified pipefitters, the parties contemplated that some overtime and other incentives would be utilized to help attract pipefitters who would be qualified to install the complicated and highly technical process piping systems involved in the Project. (Exhibit K-92/Exhibit K-169, Becica Presentation, p. 31.) (See also Exhibit K-7B, section 2.1.1 and Exhibit K-7B, section 3.2.1.) Reflecting the parties' understanding that additional incentive costs would be authorized, on August 16, 2000, within days of Kinetic's execution of the Contract, PFI explained to Rhodes that:
 "[Kinetic's] target price was for $10,829,000. However, it is anticipated that this will grow to approximately $14,500,000 at completion when all scope and incentive costs are included. The attached Project Cost Report carries the anticipated final cost of $14,500,000." (Exhibit K-138 — August 16, 2000 PFI Monthly Status Report/Exhibit K-169, Becica Presentation, p. 32.)
Following execution of the Contract, Kinetic continued to keep Rhodes and PFI apprised of what was becoming a worsening labor situation and continued to recommend incentives and overtime as strategies to deal with the deteriorating situation. (Exhibit K-95.) That circumstance notwithstanding, Rhodes continued to deny Kinetic's requests to implement premium pay and overtime strategies as a vehicle to attract qualified pipefitters to the Project. These labor market conditions, combined with Rhodes' decision not to authorize premium pay to compete for qualified pipefitters, had a significant impact on Kinetic's ability to attract qualified pipefitters to perform the work. Although Cameron stated that he did not believe the local market was a problem, he offered no specific evidence to support such contention. Moreover, Rhodes' witnesses admitted that Rhodes' unwillingness to pay premiums and overtime was a significant problem on the Project in terms of attracting qualified pipefitters for the complex work. Bill Voltmer ("Voltmer"), SUITT's Project Superintendant, offered considerable testimony in that regard.
C. KINETIC'S PERFORMANCE
As previously noted, Kinetic's performance was severely impacted by many factors outside its control. The closest Kinetic was able to come to its original work plan was during the October-December 2001 time period. During this time, several elements of Kinetic's original work plan began to fall into place. First, SUITT and Rhodes had finally hired a replacement project engineer to direct the design of the process piping work. In October Rhodes finally approved expanded work schedules and added a night shift to help attract qualified workers. In November the process piping design was finally completed (Exhibit K-169, Becica Presentation, p. 14). In December, the Building Elements were finally completed. (Exhibit K-169, Becica Presentation, p. 17). Finally, during this time period, Kinetic was given "boss hand" status as a means of reducing the serious trade-stacking problem that had been created by the late delivery of Building Elements and the resulting restricted work space.
Through the confluence of these factors, Kinetic was able to substantially improve the productivity of its work force during the October-December 2001 time period. Accordingly, as Flood testified, Kinetic was able to enhance labor productivity during this period. (See Exhibits R-7 — R-23.)
In summary, Kinetic has established all material elements of its breach of contract and quantum meruit claim and Rhodes has failed to establish any defenses to such claim. Rhodes has failed to establish the unreasonableness of any such costs, and assuming arguendo such unreasonableness, the amount by which the billings were unreasonable. InJohn W. Daniel Co. v. Janaf, Inc., 169 F. Supp. 219, 225 (E.D. Va. 1958), the court explained that the burden rests with the owner to establish that the contractor is not entitled to its cost plus fee:
 "Under a cost-plus contract such as in this case, no consideration is given to anything other than the cost items involved, unless the objecting party proves that the work was done in such ruthless disregard of the contractor's `obligation to be tantamount to fraud or gross negligence.'"
In Joe Bonura, Inc. v. Livingston S. Hiern et al., 419 So.2d 25, 29 (La. App. 4 Cir. 1982), the court explained the nature of the contractor's burden of proof for a cost-plus contract:
 "Under a cost plus contract, where the owner denies being indebted to the contractor, the contractor has the burden of proving each and every item of expense in connection with the job, and he must itemize each and every expenditure made by him. [Citation omitted]. In this case the plaintiff identified, in globo, a series of bills, periodic statements of those bills and balance sheets reflecting expenses and payments concerning the job The identification and introduction into evidence of these documents satisfied the plaintiff's burden of proving each and every item of expense in connection with the job."
Finally, in Walsh Service, Inc. v. Feek et al., 274 P.2d 117, 120 (Wash. 1954), the court identified the only circumstance in which the burden of proof will be shifted to the contractor to justify the reasonableness of its cost-plus charges:
 "If the aggregate cost upon the fact of the account is so excessive and unreasonable as to suggest gross negligence or fraud, the law would impose upon the contractor the duty of establishing the bona fides of his performance of the work."
Given that the Rhodes project went from an estimated $30 million project to an approximate $90 million project, Rhodes' contention that the increase in Kinetic's target price estimate from approximately $10.8 million to over $18 million was grossly negligent or fraudulent is flawed. Under these facts Kinetic does not have to establish the reasonableness of its billings on a line by line basis. This conclusion is inescapable since at the time Kinetic's contract was executed, Rhodes' agent, PFI, was already estimating $14.5 million for the process piping work, once scope changes and labor premiums were included, and thus did not contemplate the large engineering scope that Kinetic assumed, or the substantial impacts that were imposed on Kinetic by the construction and design delays. In that context the evidence is clear that the cost plus billings submitted by Kinetic were reasonable under the circumstances. (See discussion in Section II. E of the Decision). It should be also noted as well that Rhodes never challenged these billings during the course of the work.
D. KINETIC'S BREACH OF CONTRACT CLAIM IN THE AMOUNT OF $4,392,618
In Rhode Island a party will establishes a breach of contract claim when that party demonstrates a "violation of a contractual obligation, either by failing to perform one's promise or by interfering with another party's performance." Demicco v. Medical Associates of Rhode Island,Inc., et al., No 99-2512 (D.R.I. filed July 31, 2000).
Kinetic proved such a breach at trial. Kinetic had a written agreement whereby it was to be paid for the work it did on a time and materials basis. Although the contract contemplated that it might eventually be converted into a lump sum or GMAX contract, this conversion never occurred. Kinetic has not been paid for approximately $4.4 million of the work that it performed and properly billed on the Project. Each element of Kinetic's breach of contract claim has therefore been met.
Rhodes has attempted to persuade the Court to treat the Contract differently, as if the target price estimate contained in the Contract to reallocate the risk specified therein should be rejected. In Fondedile,S.A. v. C.E. Maguire, Inc., 610 A.2d 87, 97 (RI 1992), a case involving a contractor who asked the court to equitably adjust the contract (to allow for reimbursement of certain unexpected grout costs the contractor incurred), the court explained:
 "As a general rule contracts among equals are not subject to post execution judicial scrutiny for fairness or reallocation of risks and rewards. Fondedile is an international contractor with vast experience in major public works projects, and this experience made it an equal when it negotiated the contract with the city. The bid and the contract documents clearly transfer the risk of unexpected soil conditions to Fondedile. The contract clearly makes payment based on linear foot of root pile installed and provides no allowance for grout payments based on cubic yard of grout consumed. The plaintiff requests the court to alter the terms of this understanding. It would be unjust after execution of the contract and completion of the work to deprive the city of the benefit for which it bargained. If the city was enriched because it made a good deal for itself, the enrichment is not unjust. Although the plaintiff may have negotiated a bad contract, the surrounding circumstances do not satisfy the prerequisites for recovery in quasi-contract."
Essentially, Rhodes undertook the risk, and obviously hoped to reap the rewards, of a cost-reimbursable contract. As Cameron testified, in cost-reimbursable contracts, the contractor will charge less in terms of its mark up on the underlying costs, specifically because it does not have the risk associated with a lump sum or GMAX contract. Not only did Rhodes contractually assume the risk of a cost-reimbursable contract, but it specifically reserved control over items such as whether to pay premiums to attract qualified labor to the project. The Court will not rewrite the Contract to include provisions now favorable to Rhodes that were never negotiated and consensually included in the Contract. Kinetic has established all elements for recovery of its breach of contract claim under the Contract.
E. KINETIC QUANTUM MERUIT CLAIM IN THE AMOUNT OF $4,392,618
Under Rhode Island law, a plaintiff is entitled to recover under a quantum meruit theory if plaintiff conferred a benefit on the defendant; defendant accepted the benefit; and under the circumstances it would be inequitable for the defendant to retain such benefit without payment of the value thereof. Fondedile, S.A. v. C.E. Maguire, Inc. et al., supra,610 A.2d 87, 97. In this case, each of these elements has been met by Kinetic's proof.
Kinetic established the reasonable value of work performed by Kinetic on the Rhodes project to be $18,153,64.34, utilizing two methods, neither of which were challenged or countered by Rhodes by competent expert testimony. Allowing for such sums already paid by Rhodes to Kinetic, Kinetic is entitled to recover $4,392,618.
Under the first method, Flood went through each of the components of the billings submitted to Rhodes. He testified that based on his fifteen years experience as a construction manager overseeing process piping contractors in the Northeast, his seven years experience as a process piping contract with Kinetic, and his substantial knowledge of the other pharmaceutical process piping projects in the greater Rhode Island area, each of these contractually charged rates were within industry standards existing in the greater Rhode Island area during the period of the Project. Specifically, he testified that the contractually agreed mark up rates for certain components of the Project, including general conditions, were each within industry standards for such projects in the area.
Under the second method, Flood testified that based on his 22 years managing process piping work, and based on his knowledge of certain severe impacts on the project — i.e. the EPCM and Building Elements problems discussed previously — the $18,153,64.34 charged by Kinetic was a fair and reasonable charge for the work performed by Kinetic.
Rhodes introduced no credible evidence to contradict these reasonable value conclusions. The only evidence Rhodes attempted to offer was an opinion proffered by Cameron at trial, that the process piping work should have only cost approximately $12 million. Considering that Rhodes' agent PFI had estimated the process piping work at $14.5 million even before the substantial negative impacts to Kinetic's work and expanded work scope, Cameron's opinion is not persuasive. Cameron in fact admitted that if Rhodes had contracted for the project through a lump sum contract, the contract price would have exceeded $20 million.
III. RHODE'S BREACH OF CONTRACT AND FRAUD AND MISREPRESENTATION CLAIMS
Rhodes has advanced a variety of defenses to Kinetic's claims during the course of the trial. Those can be best understood in the context of the two counterclaims it has asserted, namely breach of contract and fraud and misrepresentation, and its overall contention that Kinetic breached a "partnership duty," so-called, embodied in the Contract.
A. RHODES' EVIDENCE OF ALLEGED BREACH/MISCONDUCT AS ALLEGED IN THE COUNTERCLAIM
With respect to these allegations, Rhodes contends that Kinetic: (1) failed to complete its work, for which Rhodes has back charges against Kinetic in an unspecified amount, and (2) failed to provide services "in an amount close to the contract target price."
(1) Rhodes' evidence regarding back charge for Kinetic's alleged failure to complete work.
With respect to allegedly uncompleted work, Rhodes failed to introduce any evidence to support that Rhodes is entitled to any back charges. The Kinetic contract was a time and materials contract, as previously found by the Court. Therefore, even if Rhodes did have some quantified amount of work that was originally within Kinetic's scope of work, and then was completed by another contractor, this would simply represent a shift from one cost-reimbursable contractor to another cost-reimbursable contractor. By definition there would be no damages. See Schiro-DelBianco Enterprises, Inc., v. NSL, Inc., 765 So.2d 1087, 1090-91 (La. App. 4 Cir. 2000) in which the Court stated: ("[W]e hold that the parties had a cost plus percentage contract. It follows that any damages awarded [owners] for `cost to complete the work' must be reversed, because in a cost plus percentage contract `cost to complete the work' is not recoverable. . . . The owner can never recover the cost to complete the work in a cost plus percentage contract because the contractor is responsible for, and only receives payment for, work actually performed.").
(2) Rhodes' allegation that Kinetic breached the contract by not coming close enough to the target price.
With respect to Rhodes' contention that Kinetic breached the contract by failing to provide services "in an amount close to the target price," Rhodes seeks to support this legal theory with two items: (1) Cameron's testimony that a "cost-reimbursable target price contract" encompasses an obligation beyond that of a cost-reimbursable contract; and, (2) the assertion that as a matter of law "target" means something different than "estimate."
With respect to Cameron's "cost-reimbursable target price contract" theory, Cameron acknowledged that he was not a participant in the negotiation of the Contract and had never previously worked with any target price contract. Cameron's theory lacks any evidentiary underpinnings. It certainly does not override the express terms of the Contract and other evidence that supports the literal terms of the Contract as previously discussed. It is abundantly clear that such a general notions could not override the express and repeated contract language in this case which specifies that the "target price" was not a factor in Kinetic's entitlement to payment, rather that such entitlement was based on hours worked and materials furnished.[1] (See Contract, Exhibit K-7B, sections 2.1.1 and 2.1.3.) Moreover, the Court is aware of no caselaw that would allow the literal terms of the Contract to be contravened in such fashion.
B. FRAUD/MISREPRESENTATION CLAIM THAT KINETIC BILLED OFF OF FLAWED FORECAST
The allegations of fraud/misrepresentation each appear to contend that Kinetic billed Rhodes based on the inaccurate Earned Value Reports ("EVR") that Kinetic submitted to Rhodes during the months of July and August of 2001. Very simply, there is little evidence to support this allegation. The undisputed testimony from Flood, Normandt, and Alex Conforti, a Kinetic official as well, was that the EVR estimates were solely a forecasting tool used by both Rhodes and Kinetic, and that Kinetic never utilized these figures in its invoicing. Rhodes has produced no reliable evidence to counter this testimony.
With respect to the allegation that Kinetic charged for unapproved work without the requisite authorization, and Kinetic thereby fraudulently misrepresented the work it performed for Rhodes, none of the components of that charge have been supported by evidence. Rhodes has introduced no evidence that Kinetic "charged for unapproved work without the requisite authorization," nor has evidence been introduced that Kinetic "fraudulently misrepresented the work it performed for Rhodes. In addition to Rhodes' failure to produce evidence that Kinetic billed off of the EVR reports, Rhodes produced no evidence to establish the necessary elements of intent, reliance, causation and/or damages.
Rhodes' other theory appears to be that Kinetic fraudulently misled Rhodes into keeping Kinetic on the project through the misreporting. The essential elements of a fraud claim are: "(1) the defendant knowingly made a false representation, (2) thereby to induce the plaintiffs to rely on it, (3) the plaintiffs justifiably did rely on it, and (4) that plaintiffs were damaged by that reliance." Rhode Island DepositorsEconomic Protection Corporation v. Fleet Financial Group, Inc., C.A. PC 96-5668, November 2, 1996 (citing Cliftex Cothing Col, Inc., v. DiSanto,88 R.I. 338, 344, 148 A.2d 273, 275, (1959); Travers v. Spidell,682 A.2d 471, 472-73 (1996). There must be some evidence to support each of the elements the fraud claim.
(1) Rhodes failed to prove that Kinetic intended to defraud Rhodes with the faulty EVR reports
Rhodes took the position during the trial that Kinetic had intentionally falsified its earned value reports. Rhodes' evidence to support this contention was unconvincing. It was undisputed at trial that Kinetic's database for reporting earned value progress contained programming errors. This was pointed out to Kinetic in July of 2001, and after attempting to correct the errors through August 2001, it was determined that the errors in the database were too extensive to correct, and a new reporting system was developed and implemented. Normandt was complimentary of the replacement progress reporting system implemented by Kinetic.
The Kinetic official who had been in charge of overseeing the earned value reporting was Tom Hauer ("Hauer"). Hauer testified and explained how the error had been made in the earned value reporting database. Because the completed design had not been delivered at the early stages of the project as set for in the Contract, Kinetic had not been able to implement an earned value database based on line-by-line cost estimates, as was Kinetic's normal practice. Rather, it had attempted to fold in line-by-line estimates on an ad hoc basis as installments of the design were sporadically delivered throughout 2001. This process had led to an overly complicated and systematically flawed EVR database system.
These problems were exaggerated by the fact that PFI and SUITT largely ignored and abandoned the contractual change order process. A key component of the EVR tracking database was the "Approved Change Order" column. Kinetic's cost engineers were attempting to manage the accumulating change order requests by "hiding" the allocated value in the change order requests within the Approved Change Order column (these could not be shown to be approved change orders, since they were not approved), so that this information could be "unhidden" if and when the change order proposals were approved. In this attempt to adapt a spreadsheet that was not designed to address these unforeseen events, the "Approved Change Order" column as well as other aspects of the report were misprogrammed. Specifically, the Approved Change Order column was erroneously linked to other columns, resulting in a "double dipping" situation which misreported the hours expended. In addition, during this effort to adapt the database methodology to fit the actual Project as it unfolded, the values in the Approved Change Order process had apparently been overridden by the value of "6" in each column. When viewed in their totality, Rhodes has not persuaded the Court that these errors amounted to intentional misrepresentation of the progress of the process piping work. Nor, does the Court conclude that such error constitutes a material breach of the Contract. As a threshold matter, these errors were obvious upon an even cursory inspection of a print out of the earned value report. Because of the double counting, many of the lines were reported as more than 100% complete, for instance as 129% complete. If Kinetic were attempting to mislead Rhodes' construction managers as to the project status, it would not leave such obvious indicators.
Even more significantly, Kinetic itself relied on the faulty EVR reporting system in submitting its first proposal in June of 2001. Both Flood and Hauer testified that the GMAX proposal submitted to Rhodes in June of 2001 was based on the same flawed EVR reporting system as was discovered by Cameron in July. Exhibits K-147 and K-148, introduced through Hauer, reflect the GMAX budget and terms that Kinetic submitted to Rhodes based on this faulty EVR reporting system. All of this testimony was uncontested. It cannot credibly be contended that Kinetic intentionally falsified the EVR reports to show the Project further along than it actually was (such that projections of cost to complete were understated), when Kinetic offered to be bound to a GMAX based on this same faulty reporting system.
Finally, Cameron's suggestion that Kinetic resisted providing information to him in connection with the EVR reporting was completely contradicted by Voltmer, a SUITT official Voltmer had responsibility for day-to-day interaction with Kinetic. (Voltmer Designations, 29:1-25.)
(2) Rhodes failed to present any proof of reliance and causation resulting from the flawed EVR reports
Assuming Rhodes could have proven the intent requirements, Rhodes produced no evidence to support any of the additional requirements of its fraud theory, Rhodes must prove that it relied, to its detriment, on the misrepresentation. This type of proof might take the form of proof that, had Rhodes known the true state of progress of the process piping in July 2001, it would have hired a different contractor to complete the work, and would have saved some finite amount of money in the process. Rhodes never produced any such reliance evidence. Moreover, Rhodes did not produce evidence that the misreporting error, discovered soon after the process piping began (see Exhibit K-169, Becica Presentation, p. 64), caused any form of damages, such that Rhodes would have done something differently but for the faulty EVR reports in July and August.
C. ALLEGED BREACH OF PARTNERSHIP DUTY
The Contract does in fact provide for a "commitment as a true partner and cooperation between the parties" and thus creates a duty of collaboration between the parties. (Exhibit K-7, section B.) Consistent with that partnership, the Contract contains an implied covenant of good faith and fair dealing. See Centerville Builders, Inc. v. Wynne,683 A.2d 1340, 1342 (R.I. 1996). The covenant imposes upon each party the obligation to do what it can to fulfill the purposes of the contract. But, based on the foregoing analysis, the Court concludes that Kinetic fulfilled that duty. Kinetic performed faithfully, albeit not perfectly, as a true partner on the Project. Kinetic's performance was reasonably diligent given the many adverse circumstances it confronted for which it was not responsible. In short, Kinetic's performance was not substantially contributive to the cost overruns that ensued. In fact, those cost overruns were substantially due to Rhodes' or its agents' failures which were outside Kinetic's control.[2]
In that Rhodes has failed to establish a breach of contract claim and to prove the threshold issues of intent, reliance, and causation with respect to its fraud and misrepresentation claim, it is unnecessary to address the various contentions regarding damages.
IV. LEGAL FEES
Kinetic seeks to recover its legal fees incurred in prosecuting its mechanics' lien petition. Although the Mechanics' Lien Statute allows for the recovery of attorney's fees, such fees cannot be awarded in that the Court has found the statute to be unconstitutional. Attorney's fees may be awarded in contract actions. (See R.I. Gen ws Section 9-1-45.) As it relates to the matters tried to this Court attorney's fees can be awarded if the Court were to find there was a complete lack of a justiciable issue of either fact or law. It is abundantly clear that the Court was presented with a controversy that necessitated judicial resolution of genuine issues of fact and law. Accordingly, the Court will not make an award of attorney's fees to Kinetic.
V. FINDINGS OF FACT AND CONCLUSIONS OF LAW
A. Kinetics' Mechanics Lien Petition/Conclusions of Law
1. The Mechanics' Lien Statute is unconstitutional.
2. Kinetic's petition is dismissed.
B. Kinetic's Breach of Contract and Quantum Meruit Claims Against Rhodes.
1. The following findings of fact are made having been established by a fair preponderance of the credible evidence:
(a) The Contract was a cost-reimbursable contract.
(b) Kinetic's performance was negatively impacted by Rhodes and its agents by delays in the delivery of the Project design and structure, change in EPCM managers, alteration of industry-design protocols, and choices regarding the labor market.
(c) Kinetic materially performed its obligations under the Contract.
(d) Rhodes has not proven any valid defenses to said claim. (e) Kinetic has performed work under the Contract for which it has not been paid and that the reasonable value of such work is $4,392,618.
2. The following conclusions of law are made on the basis of such findings:
(a) Kinetic has proven its contract claim in the amount of $4,392,618 by a fair preponderance of the credible evidence.
(b) Kinetic has proven its quantum meruit claim in the amount of $4,392,618 by a fair preponderance of the credible evidence.
(c) Kinetic is entitled to recover prejudgment interest at the rate of 12% per annum from the accrual of this cause of action. The Court accepts the interest methodology contained in Kinetic's Closing Brief, Tab "Interest Calculation", filed on May 1, 2003, which accrual is based on dated invoices as properly adjusted.
C. Rhodes' Breach of Contract and Fraud and Misprepresentation Claims against Kinectic
1. The following findings of fact are made, having been established by a fair preponderance of the credible evidence:
(a) Rhodes has failed to prove by a fair preponderance of the credible evidence that Kinetic breached it obligations by basing it billings upon flawed EVRs or otherwise materially breached its obligations under the Contract.
(b) Rhodes has failed to prove by a fair preponderance of the credible evidence that it committed fraud and misrepresentation with respect to the flawed EVR reports or in any other fashion.
2. The following conclusions of law are made on the basis of such findings:
(a) Rhode's breach of contract claim fails.
(b) Rhode's fraud and misrepresentation claim fails.
V. CONCLUSION
Judgment in this action shall enter in favor of Kinetic against Rhodes on both the breach of contract and the quantum meruit counts. Kinetic shall recover $4,392,618, plus prejudgment interest and costs.
On Rhodes' breach of contract and fraud and misrepresentation claims, judgment shall enter in favor of Kinetic.
Kinetic's Mechanics' Lien petition is dismissed.
Counsel shall prepare a form of Judgment for entry.
[1] Rhodes also argues that Kinetic breached the Contract by intentionally inflating the Contract target price. That contention, however, was not pled by Rhodes in its complaint. Also, Rhodes did not undertake to offer any significant evidence at trial to support that contention. Furthermore, Rhodes has not sought to have the Court conform the pleadings to evidence that it would suggest has been received at trial by filing a Rule 15 motion (i.e., Rule 15 of the Superior Court Rules of Civil Procedure). Rhodes in its post trial brief also suggests that the Arden Consortium ("Arden") took over a significant amount of process piping work that was included in Kinetic's target price. The evidence does not support that contention, but instead indicates that a relatively small amount of such work was shifted to Arden (less than $50,000). See affidavit of Conforti, Tab 9 to Appendix of Testimony and Supporting Materials filed on May 1, 2003. Moreover, as noted previously in paragraph III. A. (1) of this Decision, any such work would represent a shift from one cost-reimbursable contractor to another. In any event, in the context of the entire body of evidence, it does not establish that Kinetic fraudulently inflated the target price in the Contract.
[2] Rhodes' contentions regarding Kinetic's improper conversion of a contract with Atlantic Contracting Specialties ("ACS") do not warrant significant review. First, the issue was not developed in any detail at trial. Second, it was not briefed by Rhodes in its initial post trial brief. More importantly, it is clear from the record that SUITT, acting as Rhodes' agent, accepted the adjustment to the ACS contract.